The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and His Honorable Court. Be seated. We welcome everyone to the Fourth Circuit Court of Appeals this morning. We have four interesting cases, and Judge Keenan and I are particularly pleased to welcome Judge Goodwin, Joseph Robert Goodwin of the Southern District of West Virginia, to assist us in these cases. Our first case is Rivera v. Mathena. Ms. Bairmore, is that correct? Yes, Ms. Bairmore. Pleased to have you here. Thank you very much. May it please the Court, I'm Cynthia Bairmore, here representing the Plaintiff Appellant, Dennis Rivera. I would like to reserve three minutes of my time for rebuttal. Both sides agree on the legal issue at the heart of this case, which is that the Eighth Amendment protects an inmate's right to a meaningful opportunity to regularly shower and exercise. The question that's left for this Court is whether Dennis Rivera was given that meaningful opportunity. This Court should reverse because a reasonable jury could find that he was not. The basic facts in this case are not in dispute. First, everyone agrees that Rivera showered and exercised starting in 2014, usually twice or less per week while he was held for several years in solitary confinement. Second, everyone agrees that the reason Rivera did not shower or exercise more often is that he failed to comply with the Prison's List procedure. The real question then is whether that procedure gave Rivera a meaningful opportunity for compliance. We typically between 5.50 a.m. and 7.15 a.m. Second, before the list was taken, an audible announcement was to be given, but it often did not wake Rivera. Third, official policy prohibited Rivera from having an alarm clock. Fourth, when officers walked by Rivera's cell, they would not knock on his door to wake him up or accept a note left on his door asking to shower or exercise. Respondents suggest that a flat prohibition on showering or exercising is the only way to deny someone a meaningful opportunity to access those services. But while that's certainly one way to do so, it's not the only way. For example, this Court held in Brown v. LaManna that an inmate who was unable to shower or recreate because he wasn't given the crutches necessary to do so stated an 8th Amendment claim for a jury. Another way, which is what we have here, to deny someone a meaningful opportunity is to create a procedure that takes place in the early morning when that person is asleep, to not wake him up, to withhold the means for that person to wake himself up, and to then deny... What were they supposed to do to wake him up? Your Honor, Mr. Rivera suggested several possible opportunity options. Would you say they should have done something to And there are many ways to do that meaningful opportunity. So the failure to wake him up is a violation of the 8th Amendment? The failure to afford him a meaningful opportunity to access showers and exercises is what violates the 8th Amendment. And so they didn't actually need to wake him up. They could have accepted the note that was left on his door saying quite clearly in English, I want shower, I want rec. They could have knocked on his door if they wanted to get an affirmative. He put notes on his door? He did. And that is... But he did do that, and the response was that that was not enough, that he needed to affirmatively say out loud that he wanted a shower exercise. So at JA139... So he had to affirmatively say he wanted to shower, but he could refuse by sleeping. He... And you say that you can't have a meaningful opportunity to make that decision if you're asleep. Yes, Your Honor. So at JA139-141, you can see examples of signs that Rivera put on his door that say quite clearly, I want shower, I want exercise. So he was trying to affirmatively opt in, and the prison guards would not allow him to do so through that. Okay, now he's no longer in solitary confinement, though. Is that correct? That is correct, Your Honor. So don't we have a problem in terms of whether we get to this issue, at least in terms of injunctive relief? I understand your claim for monetary damages, and that's separate and apart. But with regard to injunctive relief, how do we get there in this case, analytically? Of course. So the question for injunctive relief here is really whether there's a cognizable danger of a recurrent violation. And so this court is quite clear that it can issue injunctive relief even when the violation is not currently happening, so long as there is this, quote, cognizable danger. Okay, but what does he have to do to get back into solitary? So the exact actions that he has to do are a bit unclear. Our opponents do have some control over whether he ends up back in solitary. Right, but isn't it predicated generally on misconduct of the inmate? So it is generally predicated on some sort of failure to abide by prison regulations. There is a 2016 decision by the district court in a separate litigation that Mr. Rivera brought highlighting various infractions that kept him in solitary confinement as cited in the government's brief. And one, for example, he failed to use Bluetooth speakers when he had a telephone call. He used a PREA hotline to make a non-PREA-related complaint. So the extent of misconduct at issue is not only severe misconduct of the kind of, you know, illegal activity we might think of outside of prison, but quite strict. So you're saying misuse of the telephone process could get him into solitary confinement? That was at least relied on to keep him in solitary confinement rather than being allowed to step down back into the general population. And so there is a wide variety of different issues that the prison could rely on to put him back in solitary. If this court is unsure about this issue factually, in Porter v. Clark, the court said that whether there is a cognizable danger is a factual finding. And so the court could always remand to the district court to find whether there is this cognizable danger. Does he still suffer from the skin condition? Your Honor, that's not in the record. Right. I'm asking you. I don't know personally whether he still suffers from it. But he did suffer from it for many years. And so if he doesn't... Could you tell us a little bit more about this condition? What was it? Was it eczema or, you know, what are you talking about? So I don't know the medical term for what it was. I do know it was treated. Well, what did the pleadings show? The pleadings show that he also doesn't refer to it by a specific medical name, but he did get it diagnosed by doctors requiring selenium sulfide for treatment. And so it's some sort of skin condition that is capable of spreading the itches that he suffered from for several years that he had this medication to treat. And so one thing we do know about skin conditions that are treated at Red Onion, from an earlier case to Paola, where a district court recognized that Red Onion itself does not treat skin conditions unless they burn or itch. They have a prison policy just to only treat the skin conditions that are rather serious. And so the fact that the Red Onion doctor prescribed selenium sulfide indicates based on this 2016 opinion that it burns or itches or is in some way particularly serious. When you're complaining here, are you relying on the entire 40-year period when he was intermittently denied recreation and showers, sometimes got them? Or are you pointing to any particular period like the six-week period when he got no showers or recreation? So, Your Honor, my client developed the record below pro se, and so he only introduced evidence in the 2014 and 2016 periods. And we do think that those periods are sufficient to find a violation here. And so we are relying on the totality of those periods where there was a six-week and a seven-week total denial of showers and exercise, but also even intermittently, during 80 to 85 percent of the weeks issued during those periods, he never received more than two showers or two exercise sessions. And so under this Court's decision in Sweet from 1975, that two-time-per-week access is the type of intermittent access that itself the Court recognized would be an Eighth Amendment violation, provided that there is sufficient harm to the inmate. Could I encourage you to go to due process for just a minute? Yes, please. How, if at all, do you think this Court's decision in CUMA developed or explained the earlier decision in Bevarati? How would you be able to clarify what you mean by that? Well, what I'm saying is explain your due process theory. How about that? Great. So we are looking at both the protected state interest, those created by Section 86.1.3, and then the procedures that were in place to access that. And so under the Supreme Court's decision in Loudermill, those are two very separate questions, where you look first at whether the state created a substantive right, which here it did, by guaranteeing a minimum of three showers, five exercise sessions. And then you look at whether the procedures to access that state created substantive right are adequate under the due process clause itself. And so that is the three standard weighing factors, the private interest, the risk of erroneous deprivation, and the government's interest that you would balance. How is this an atypical hardship? So he only was able to access, so the first question is, what is the baseline? And so the atypical hardship here relative to the general population, he, being in general population now, is able to access all of the showers that he requires, whereas even under the level guaranteed to other inmates in solitary, he was only getting 8 to 10 percent of what was required there. In that case, the inmates were in solitary for six months, the cells were infested with vermin, they were covered in feces, there was flooding, there wasn't much bedding as required by regulations, and this court said the inmates had not shown an atypical hardship in relation to the ordinary incidents of prison life. Later there was a Supreme Court case, and then this court decided in Nkuma, which seems to me to be broader in its scope than what I call the rat case of Everotti. Yes, I think that Nkuma certainly set forth a broad understanding of what the Due Process Clause guarantees in the circuit, and it set forth this atypical hardship understanding where, I think under any view of atypical hardship here, you can either compare him to the general population or the population solitary. This is not a question of occasional denial. I'm asking too many questions, but I just wanted you to get to this. How can you have an Eighth Amendment violation that doesn't amount to an atypical hardship? Well, so those would be two very separate questions. Atypical hardship coming under the Due Process Clause. Recently... How do we get the Due Process, I mean the Eighth Amendment here comes through the Due Process, right? I'm sorry? To the states, I mean the Eighth Amendment, this is a state case, right? Yes. So it's applicable because of the Due Process Clause. So, Your Honor, my understanding is that the Eighth Amendment claim really just comes from the Eighth Amendment itself, where the prohibition... Oh, okay. I beg your pardon. What I'm trying to get you to tell me is, do you think every time there's an Eighth Amendment violation, there is an atypical hardship? And where would you draw that line based on your research? So, my understanding from whether there's an Eighth Amendment violation is that it has to be a sufficiently serious deprivation. That's what this Court's language has held, that minor violation and occasional denial is just not up to snuff on that. So, for example, in this Court's decision, Jonathan Lee X, the Court compared what would be significant enough, but a several-month denial would. So in Brown v. LaManna, similarly, two months was enough. That was considered sufficiently bad. In terms of whether that is atypical... Do you think the Eighth Amendment claim is better than the Due Process claim? I think they're both quite strong, Your Honor, and I think that the main... Do you think the Eighth Amendment claim is better than the Due Process claim? You didn't answer my question. No, I don't. So, I think that... So, do you think they're a package deal? I think the main difference is the source of the... Do you think they're a package deal? We have trouble with these lawyers that don't answer questions. So, they are... We're trying to ask a question and we're looking for an answer. Yes, yes. Are they a package deal? If you prevail on the Eighth Amendment claim, do you also prevail on the Fourteenth Amendment claim? Not necessarily. If you prevail on the Due Process claim, do you also prevail on the Fourteenth Amendment claim? I don't understand it. Yes, so it's really the question of source of the right. Okay, but is there any reason for us to even address the much broader issue of Due Process if we agree with you on the Eighth Amendment claim? There's no need for this court to do so. It's certainly sufficient to reach only the Eighth Amendment claim. So, you're satisfied if you can get us to send it back on the Eighth Amendment claim? Yes, Your Honor. And you'd be satisfied with that? And what do we do about the rash? So, I think the best way to understand the Eighth Amendment... Is there a surplus agent here? So, it's... The rash claim? They are slightly different. I understand you've got a client down there in Red Onion and you sort of volunteer in an analyst case, but you're the only one we got. Yes. So, you have to answer. I will. So, you want to win on the Eighth Amendment claim? You don't care about these other two? Your Honor, we do. To be perfectly clear, we do care about them. They do overlap. I want to acknowledge that. They all depend on whether my client was given a meaningful opportunity to access these services. He can get complete relief under the Eighth Amendment claim if we agree with you on that. Certainly. And so, to the extent this court would prefer to talk more about the Eighth Amendment claim, I'm happy to do that, to talk about this court's precedent, or the due process claim, because the real difference there is just the source of the right that gives him this guaranteed need to get a meaningful opportunity to access. And so, the source of the right for the due process claim is, of course, 861.3, the Virginia Code. And the source of the right in the Eighth Amendment claim is the Eighth Amendment itself and this court's precedent about what is a sufficiently severe hardship. I do want to speak just briefly to our jurisdiction. This court asked for supplemental briefing on that point. We do not think that it's necessary to waive any ability to amend the complaint out of command. However, if this court disagrees, we are willing to do that with respect to the two other defendants. You have to have a final order come up here, don't you? Yes. You think you have one? Yes, Your Honor. But it's not all gone. So, it is, in our view, it is gone. So, this court has said that the real question for whether it's final is whether the defendant could simply, or the plaintiff could simply amend their complaint to save their case. And here, the district court made quite clear that its view is that it was Rivera's choice not to shower or exercise, and so all of his claims failed. And the only reason it treated these two defendants differently was because one couldn't find one of them, and two, the other one didn't respond. Are you willing to stand on your pleadings with regard to Defendant Stay and Brewer? Yes, we are. If this court has no further questions, I'd like to reserve the rest of my time for rebuttal. Thank you. Ms. Jones, good to have you here. Thank you. Good morning, Your Honors, and may it please the Court. My name is Brittany Jones, and I'm here today on behalf of Defendant Apeliz. Because Rivera has indicated that he's willing to stand on his existing pleadings as to Officers Stay and Brewer, we agree that this court has jurisdiction to hear the merits of his appeal. Shifting, for that reason, to the merits, I'd like to start out with three main points. First, Rivera cannot satisfy the prerequisites for equitable relief because he is no longer subject to the policies that he challenges and cannot show a cognizable danger of recurrence as to him. Okay, now what about, though, our recent decision in Porter v. Clark? I mean, we have to look at the overall picture, don't we, and the likelihood that these conditions could recur. And it seems to me that the Petitioner, Mr. Rivera, has a pretty strong argument that the record is unclear on this. In other words, we don't know. Certainly a person could get into solitary for reasons other than misconduct, couldn't they, for safety issues, if they need to be segregated from violent activity or something. So it's not necessarily his misconduct that would end him back up in there. Don't we have to have development in the record here before we can say that this is a condition that's not likely to recur under Porter v. Clark and the analysis we employed there? Porter, Your Honor, was a voluntary cessation case, so I don't know that it necessarily applies categorically in this context where the conduct wasn't ceased because the prison has changed its policy, but rather because Rivera has completed the step-down program. Right, but it still stands for the principle that you have to look at the whole picture in determining whether something is likely to recur, don't you? That's true, Your Honor, and there are two ways that one can end up in segregated confinement, although I'm not positive that one could end up in intensive management as a result of a protective need. I think largely that happens because of rules violations, and I would point this Court to its decision in Encuma v. Osmunds, and you can find that at 507 F3D 281, which involves a very similar set of circumstances where an inmate was challenging restrictions at his current level of confinement, and during the pendency of the litigation, he was removed from that level and put in a less restrictive housing environment, and what the Court said is that because recurrence largely turns on this question of whether the plaintiff engages in violations of prison policy, we don't assume that someone is going to do that and thereby put themselves in the position of being subject to the same policies again, and I think that's also consistent with what the Supreme Court has done in a series of cases like Rizzo and Lyons, where recurrence of the challenge of action is contingent on some sort of adverse interaction with the law enforcement. Some sort of misconduct. Right, or the judicial process. Let me ask you a question, Ms. Jones, that's kind of befuddling me about this. Isn't there a really simple solution to this case? Have them blow a whistle. Have them have a sign-up sheet. I mean, we're here arguing about something that's got a simple, obvious, and really cost-free remedy. So, why not do it? Well, Your Honor, I wanted to make one point with respect to the signs that Rivera alleges that he put up, and specifically that. No, no, I don't want to argue what he did and what he didn't do. I'm saying there is a simple, cost-neutral remedy. Make an announcement. Blow a whistle. Do something loud. Why not do it? Why are we here arguing and, you know, churning through hundreds of pages of paper when there's a really easy solution? So, Your Honor, I guess I would take issue with the premise that the officers aren't making an announcement, and I don't read Rivera's brief as alleging that they aren't making any announcement. Oh, we'll do something loud. Prisons do a lot of things loud. I mean, I used to represent a number of criminal defendants, and they do a lot of things loud. I know that. So, I mean, they could do this one loudly as well. Why not? Well, Your Honor, the reason the policy exists as it does, and it does permit officers to blow a whistle, so that is something, again, that's sort of within the bounds of the policy as written. But the reason why the policy is as it is, and I think the sort of crux of his complaint, is that it doesn't require officers to wake someone up if they walk by their cell. Right, but you're saying, see, what I'm hearing from you is you'd rather litigate this than blow a whistle, and that just kind of defies common sense to me, with all due respect. Your Honor, I think that the officers, again, they have the option of blowing the whistle, but I actually don't think that blowing the whistle. Let me start you to consider whether there's another remedy rather than running this to the full course. Judge Goodwin has a question for you. How is it a reasonable opportunity to refuse if the man is unconscious because he's asleep? You're just deeming a refusal. How is that meaningful? Well, Your Honor, I agree with you that if one is asleep and you ask someone a question when they're asleep, they don't have a meaningful opportunity to answer the question. I don't disagree with that, but the policy is designed to wake inmates up. That's why there's an audible announcement at the outset, and that's why there is engagement with the inmates as the officers walk by and take the list process. And I think one of the best evidence of how the process is actually working in practice comes in Rivera's own pleadings, where you see that he alleges the other inmates in his cell block actually are taking advantage of shower and recreation opportunities. That's the basis for his original equal protection violation claim. And so, again, I think what that shows you is that the process isn't designed as an artifice to defraud people of shower and exercise opportunities. Maybe just him. It might be true that Rivera is a particularly hard sleeper and that what's sufficient to wake everyone else up isn't sufficient to wake him up. But then he leaves these notes on his door. Doesn't that indicate to anyone that this guy wants to take a shower? So, Your Honor, I do want to address the notes. First of all, all of the notes, if you look at the citations in the record, they all post-date the conduct that's at issue here. But I think more importantly, when he talks about leaving notes on his cell, he's talking about leaving notes after the list process has already completed when people are out taking inmates to the shower and recreation areas. And that's the problem. If Rivera had put a note on his cell during the list process, then I actually think there's every reason to believe that officers would take that as an indication that he's interested in these opportunities. Back to Judge Keenan's question. Here we are with people ignoring notes posted whenever, ignoring complaints that he filed, and reportedly asking for showers and recreation over and over. And yet you would rather continue that policy than just try to wake the guy up? Your Honor, I would like to point the Court to the substance of the complaints, because I do think had Rivera written a bunch of grievances that says, hey, I'm asleep, no one's waking me up, this is unfair, I can't express my desire to shower and recreate if I'm asleep, if that had been the substance of his grievance, I think we would have a very different case. But if you actually look at the substance of his grievances, it's not about that. It's about people intentionally depriving him of showers. It's about officers retaliating against him. And actually not a single one of his grievances mentions sleep. It's actually only in response that he gets a response back from the officers that say, you're not being intentionally deprived of showers, you're being deprived because you're asleep. And the officers, again, I understand this intuition that he's asleep and so they should know, that means he's not given a meaningful opportunity, but the officers have no way of knowing if Rivera's asleep because he wasn't awoken at all or because he went back to sleep because he's uninterested, because he doesn't feel like complying that day. And again, this is a case that requires the court to find deliberate indifference. And unless his grievances actually refer to the policy that he sort of narrowed his appeal to here, there is nothing in the record to show that the officers were deliberately indifferent to a problem with the procedures that were implemented, as opposed to various other problems that Rivera appears to have had with the officers. That's a lot more legal talk than blowing a whistle, isn't it? Your Honor, I agree that we can always sort of hypothesize better ways to do this, but I think that's part of why this court has said that the court typically doesn't sort of get involved in the nuances of prison administration because the officers are the ones on the ground and they have the best window into how these things work and sort of why they work the way they do. Is this the way they do it throughout the state at their other facilities or is this just for the solitary confinement? I'm not certain, Your Honor. I do know that Red Onion is a particular type of prison. It's a pretty rough place. It's designed to house problematic inmates, and so there is a significantly higher proportion of inmates housed in various sort of levels of segregated confinement, and the general population is significantly smaller. But again, I think that's part of the reason why they're— So they're sort of atypical anyway, right? Well, I think it shows why there are administrative difficulties that are unique to Red Onion because a lot of things have to happen on an individual basis. Goodwin and I both were in the Army one time. They used to blow reveille in the Army. That was to wake everybody up. It worked? I'm not sure, Your Honor. And again, I don't know that a whistle would really resolve Rivera's problem here because, again, if the point is that there are some inmates who are particularly hard sleepers, I think the only way that an officer could truly know that someone is awake would be to require some sort of verbal or physical reaction from the inmate, and then you get into a situation where some inmates won't respond, and what is the officer supposed to do? And if this court says you have to ensure that every inmate is awake, then ultimately what you're saying is that the officers are going to have to enter the cell and physically rouse someone, and the risks of that are sort of, I think, obvious on its face, and that's why, again, the policy is the way that it is and why it doesn't require officers to get some sort of reaction from the inmates. I'd also like to turn a little bit to qualified immunity and specifically the court's decision in Sweet because that is what Rivera points primarily to as the foundation of his clearly established right here, and I don't think that it can serve that purpose for at least four reasons. First, Sweet is a case about intentional limitations on the number and frequency of exercise and shower opportunities. It is not a case about whether the procedures attached to those opportunities are, quote-unquote, meaningful and where that line falls. Okay, so you're asking us to decide the issue of qualified immunity in the first instance? Yes, Your Honor. We think the easiest way— The district court didn't decide it. That's correct, Your Honor, but this court has made clear that the court can affirm on any basis, and we raised— Well, we can, but we also have said on more than one occasion that we're a court of review rather than first view. That's correct, Your Honor. This argument was made to the district court, and the district court chose to decide the case on the merits, and we think that the sort of judicially efficient way of resolving it would be to decide this case and decide the qualified immunity issue, in part because, again, there's not a single case in this court that deals with a situation challenging procedures. I mean, it's hard to think that what they did here was not intentional. Going by every day six weeks without showers, they didn't notice that? It wasn't an intentional act not to give him a meaningful opportunity? That is some way to actively express his refusal? Your Honor, I think one thing that's important to remember about this case is that you have different officers compiling the list and different officers taking inmates to and from the shower and recreation areas, but you also have different officers compiling the list on different days. And so just because an officer looks back and sees, you know, Rivera has denied for a series of days, he doesn't have any indication as to why. And it is perfectly plausible that an inmate would sort of, for reasons of protest, decide that he doesn't want to shower for a period of time. Is there anything in the record to support that? Well, Your Honor, I think it's sort of common knowledge that if all you see, all the officer has in front of him is a prison log, there is no sort of additional context that they would have in terms of why the refusal happened or that the refusal wasn't genuine. And again, Rivera is seeking to impose personal financial liability on these officers. Mr. Rivera is not the only person at Red Onion that's complained about not getting showers or recreation. I don't doubt that, Your Honor. But again, as far as this record is concerned, we do have evidence that the procedure was working as to his cell block. And so there is no evidence that – I think if this was a case where you could – you can devise some sort of procedure that is pretextual in nature, that, again, is sort of so obviously designed to deprive people of their opportunities. But sort of a mischaracterization for you to call it a refusal when what you have is silence. Your Honor, I think that the officers interpret it as a refusal. I understand that. It's an implied refusal. Exactly, Your Honor. All right. But aren't you really making a case to send it back for development of the record when you say we don't know about the other people in solitary? We don't know whether they were similarly denied. We don't know if he's the outlier or if he's the norm. I mean, don't those facts need to be developed in order to properly dispose of this claim? No, Your Honor, because here I don't think this is a situation where the officers sort of have one version of the facts and Rivera has another. I think the facts that Rivera has put into the record largely contradict. But I'm talking about missing facts. In other words, the baseline population of other people in solitary. If we don't have that information, then it seems to me we lack complete knowledge over whether there's been an Eighth Amendment violation, excuse me, whether qualified immunity would apply. I mean, in terms of, I mean, we need to look at the law, but we also need to have some sense of what the facts were on which we're basing that legal analysis. In other words, is he an outlier or is this happening to everybody and the prison knew about it and turned their head? That would make a difference for qualified immunity, wouldn't it? No, Your Honor, because again, this court has never addressed the question of whether a procedure is inadequate because it inherently has some risk of depriving people of shower and recreation opportunities. All of this court's cases deal with the intentional limitation on shower and exercise opportunities. The officers knew about the skin condition, didn't they? Yes, Your Honor. Okay, and still they made no effort to get him to the shower. I mean, a doctor had prescribed that he needed to wash this medication off. The doctor was assuming that he was going to get showers because the doctor said wash it off three times a week, which was the allocated number of showers for the prisoner. And so it really, on this record, it looks pretty bad. I mean, it seems to me that, you know, you're in pretty bad shape, you know, based on the facts here that we have in front of us. A couple of responses, Your Honor. You said you had a policy not to treat these things, right? No, Your Honor. Not to treat the rash? You had some kind of a policy not to treat the rash? No, Your Honor. Rivera was receiving treatment. He was able to access a doctor, and he was able to access his medicated cream. So the only question was whether he was able to shower in a way— Part of the treatment was to wash it off, wasn't it? That's correct, Your Honor. Right, so you weren't treating him. Well, Your Honor, he did have the opportunity— I think Judge Gregory wrote it. Maybe I wrote it. Judge Gregory was on it. It wouldn't treat a fellow in the prison system for hepatitis because he had a policy. That's correct. You're not going to treat him for hepatitis if he's going to be eligible for parole within the next 24 months or so.  That's correct, Your Honor. No, you're not going to let him wash his medicine off, which is part of what is supposed to be done. I believe, Judge King, you're referencing the court's decision in Gordon where the prison had— Yeah, I'm thinking about Gordon. Judge Gregory and I decided that that's a two-person panel. Right. In Gordon, the prison had a categorical— Did you argue that case? No, Your Honor. Okay. But the prison there had a categorical policy that excluded certain inmates— But it was Virginia. That's correct, Your Honor. And you wouldn't treat the fellow for hepatitis because he was going to be—he's eligible for parole. That's right, Your Honor. In the next 24 months. If he was eligible for parole, he didn't get treated for some reason. That's correct, Your Honor. But what the court made clear in Gordon is that medical deliberate indifference requires knowledge, not just of the underlying medical condition, but also that a failure to treat is going to result in a serious problem for this person. And I think in the context of hepatitis, there's an obvious risk there. And the officers—the defendants in question there had all varieties of notice, from the form of explicit notice by the inmate to the fact that they had written the policy and procedures that actually discussed the consequences of not treating hepatitis. And, again, there was an express policy not to treat a certain subset of inmates with this disease. Here, that's not the case at all. Because, again, the question isn't whether officers have intentionally said, Rivera, you can't shower. The question is whether the procedures as they implemented it had sort of inadvertently that end result. And, again, as to this directive— Well, they didn't try to wake him up. That's correct, Your Honor. So he could go shower. That's correct, Your Honor. And they didn't blow a whistle. They didn't blow readily. They just let him sleep. And they took silence as a refusal. And you even get up here and called it a refusal. It was an implied refusal in your view. That's correct, Your Honor. But as to the directive to wash, I think what's important here is that Rivera did have the option to wash off his solution in his cell. There's no allegation whatsoever that he didn't have running water or wasn't able to access a cloth or some sort. Right, but we don't have anything in this record that shows that that's just as effective. Well, Your Honor, I do actually think there's something in the record. And you can look at JA 116 through 122. Rivera agrees a number of times to medical staff that he is unable to access showers. And as a result, his thrash is getting worse. And he actually expressly asked them to give him some sort of note that he can put on his door that says, I am prescribed showers for my medical condition. And presumably because this problem is recurring, they don't do that. And I think that suggests that the medical professionals did not actually think that he couldn't achieve this direction to wash off his solution in his cell, that he wasn't actually prescribed showers. You're asking us to infer that from their lack of response to his request for showers? Yes, Your Honor. I believe so. What do you think? I'm sorry. I think Judge Goodman's question first. Okay. In the context of solitary confinement where it's known that there can be irreversible psychological damages that occur due to solitary confinement, the refusal to grant showers or recreation seems to me to become even more important and to imply that there is a meaningful opportunity does an awful lot to raise the risk that there's going to be harm well beyond the growth of a rash or anything else. Your Honor, I think if you had a situation where officers had intentionally limited opportunities to shower and recreate to an amount that the court found created a sufficiently serious deprivation of a basic need, then the answer would be yes. And we're not here saying that inmates can be indefinitely deprived of showers or recreation opportunities. I think that point the court has made clear. But again, this is not a case of intentional deprivation. This is a case of procedures which are alleged to have a risk of occasionally depriving someone of shower and recreation opportunities. And those are two very different things when it comes to delivery. You say you can only do it for six or seven weeks. It is true that he alleges a period of six weeks with respect to showers. But I'd like to, unless you had a further elaboration on that question. No. I just thought you were saying six or seven weeks we can do it, but we can't do it forever. That's what you said to Judge Goodman. No, Your Honor. I think it would be a different case if you had, again, six weeks of an intentional deprivation. I do think that that would be a different case. But a couple of things to point out with respect to the six-week period. One thing is that Rivera on certain days within, so it's July that is sort of the crux of this six-week period, where Rivera doesn't identify the officers that are alleged to have deprived him of shower and recreation opportunities. And if you look at J188, he explains the reason for those absences is because those officers aren't named defendants in this lawsuit. And so I don't think that the court can hold the named defendants liable for deprivations that they did not actually have any part in. So, again, and I also think that, frankly, the record in this case is quite messy as to whether the deprivations at issue are the result of his inability to wake up or some other problems that he was having with officers. He has a variety of complaints, including that he was eating breakfast when this process was happening and the officers didn't return back to him to ask him when he wasn't eating. Again, he alleges this retaliation. There's a number of times in the record where he talks about specifically engaging with officers, and I think it's obvious that he's not asleep if he's engaging with the officers. So it is quite unclear. So did he refuse on those times? He alleges that he was telling the officers he wanted showers and recreation and that they nevertheless wrote refusal. But, again, that doesn't seem to be his theory of the case on appeal. He has limited his theory today to the procedural challenge, not the retaliatory challenge. How many solitary confinement inmates did you have out there during the relevant time?  I don't know the answer, but, again, I will say that the number is much greater at Red Onion because it is specifically designed. Give me a number. I don't want to represent something. Give me an approximate number. I really can't say, Your Honor. I apologize. More than 10? More than 100? 500? My guess is that it is more than 10, but I really don't have enough information. There's nothing in this record that shows? No, Your Honor. The only thing we have in this record is one. That's correct, Your Honor. And if the court's interested in the number, I'm happy to supplement. What about the question we asked your opposing counsel there about the 8th and 14th Amendment? Is there a reasonable distinction to be made between those claims? So I would direct the court to its decision. Or are they a package deal on how we dispose of the claims here? I don't think they're a package deal. I think they're different standards. But as to the atypical hardship standard and how it relates to the seriousness of the deprivation, I do think that there's significant overlap there. And I would point the court to its decision in Prieto where it discusses how those two standards overlap significantly, if not entirely. So to the extent this court thinks that the deprivation is significantly serious for purposes of the 8th Amendment, I do think that it's most likely it would also think that there is an atypical hardship here. But, again, that doesn't mean that there's a liberty interest. There's a step before you get to atypical hardship. And that, I think, is the more problematic piece for Rivera, particularly when you're talking about qualified immunity, because there is no case that discusses whether there's a liberty interest under the guidelines that he seeks to rely on here. Well, assuming we aren't dealing with qualified immunity in my question, I'm talking about how we deal with the two claims as they're posed here. So I still think that they're different, again, because under the due process clause, you have to find a liberty interest in some sort of statutory or other provision. Here he refers to the guidelines, and the guidelines don't create a liberty interest because they are not defined in terms that would be sufficient to confer a right on a particular inmate. Under the 8th Amendment, you have to find deliberate indifference in addition to a serious violation. So while there might be overlapping pieces, there are also independent pieces of the test that make them distinct. Okay. Unless the court has further questions. Thank you, Ms. Jones. Thank you very much. We appreciate it. Ms. Varmar. Thank you, Your Honors. There are a few points that I would like to address that my co-counsel brought up. One is this issue of other inmates. First, there is very good reason to think that other inmates at Red Onion are having similar problems with access to showers and exercise. Just last month, the Eastern District of Virginia denied a motion to dismiss a complaint by another Red Onion inmate, which is Reyes E. Clark from the Eastern District of Virginia, who is alleging sporadic showers and exercise at Red Onion. In this record, JA 196-97, in Rivera's motion to alter judgment, he refers to specific other inmates who had similar problems. We don't know exactly why they had these problems, but there is reason to believe that they may exist. Second, my co-counsel, or sorry, my opposing counsel, refers to this idea of intentional deprivations. I would like to point this court to Brown v. LaManna, this court's decision in 2008, referring to an inmate who was not getting crutches necessary to access showers and recreation. That was not an intentional deprivation. It was that he was not given the means necessary to have an opportunity to access these services. And so that is quite analogous to here, where Mr. Rivera has alleged that the situation for him prevented him from accessing these services. Additionally, if there were a legitimate penological justification to have a certain procedure, this court in Porter v. Clark recognized that is relevant to the epidemic question. And so to the extent that there is a problem with going directly into a cell security-wise, that can be addressed under the legitimate penological justification framework. But there is nothing like that here, where it seems that the whistle, there is no legitimate penological justification not to simply blow a whistle. I would also like to address the issue of whether Mr. Rivera could wash in his cell. There really is nothing in the record to suggest that that would adequately address this problem. This court's cases have addressed the need to shower, have not suggested that you can routinely replace showers with washing in the cell. And the doctor's note itself refers to the days of the week on which showers were offered. And so to the extent this court is concerned about that, it could always remand on that factual question. But the record here does not support that idea. If this court has no further questions, I will rest. Thank you. Thank you very much. And I want to thank your law firm and the others there that visited you in assisting us and this plaintiff in connection with this case. Thank you. Thanks very much. We'll come down to Greek Council and then take up the debate.
judges: Robert B. King, Barbara Milano Keenan, Joseph R. Goodwin